1

CROSNER LEGAL, P.C.
Zachary M. Crosner (SBN 272295)

2

zach@crosnerlegal.com
Chad A. Saunders (SBN 257810)

3

chad@crosnerlegal.com
Craig W. Straub (SBN 249032)

4

craig@crosnerlegal.com
9440 Santa Monica Blvd. Suite 301

5

Beverly Hills, CA 90210
Tel: (866) 276-7637

6

Fax: (310) 510-6429

7

*Attorneys for Plaintiffs*

8

9

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

10

11

SERINA SANTIAGO and ASHLEY
WRIGHT individually, and on behalf of all
others similarly situated,

Case No.

CLASS ACTION COMPLAINT

12

13

Plaintiffs,

14

v.

15

CAMPBELL SOUP COMPANY and

16

SNYDER'S-LANCE, INC.

17

Defendants.

**JURY TRIAL DEMANDED**

18

19

20

21

22

23

24

25

26

27

28

CROSNER LEGAL, P.C.

1       Movie night is a beloved pastime for families throughout America. Kids and parents look

2  forward to spending the evening together, sharing laughs and thrills while curled up on the

3  couch, often with a bowl of popcorn between them. Unfortunately, there's a secret ingredient

4  hidden in their shared snack that is more frightening than any scary movie. The popular brand

5  "Pop Secret" is heavily contaminated with harmful "forever chemicals."

6       To remedy this problem, Plaintiffs Serina Santiago and Ashley Wright ("Plaintiffs")

7  bring this action against Defendants Campbell Soup Company ("Campbell") and Snyder's-

8  Lance, Inc. ("Snyder's-Lance") (together, "Defendants"), individually and on behalf of all

9  others similarly situated, and allege upon personal knowledge as to Plaintiffs' acts and

10  experiences, and, as to all other matters, upon information and belief, including investigation

11  conducted by Plaintiffs' attorneys as follows:

## FACTUAL ALLEGATIONS

### The Products at Issue

14      1.    Defendants manufactures, markets, advertises, and sells a line of "Pop Secret"

15  microwave popcorn with labeling stating that it is "PREMIUM POPCORN" that has "NO

16  ARTIFICIAL PRESERVATIVES FLAVORS DYES." The label also states that the popcorn is

17  "100% WHOLE GRAIN," "0g TRANS FAT/SERVING," "MADE WITH NON-GMO

18  CORN," AND "NO HIGH FRUCTOSE CORN SYRUP" (the "Products" or "Defendants'

19  Premium Popcorn"):

CROSNER LEGAL, P.C.



2.      Defendants' Premium Popcorn includes ten different products which have identical labeling (other than the flavor), packaging and manufacturing process for the microwave bags that contain the popcorn kernels: (1) Move Theater Butter Flavor, (2) Homestyle Butter Flavor, (3) Butter Flavor, (4) Extra Butter Flavor, (5) Double Butter Flavor, (6) Light Butter Flavor, (7) 94% Fat Free Butter Flavor, (8) Kettle Corn, (9) Sweet 'n Crunchy Carmel Corn, and (10) Sweet 'n Crunchy Kettle Corn:

CLASS ACTION COMPLAINT

CROSNER LEGAL. P.C.



Movie Theater Butter Flavor        Homestyle Butter Flavor        Butter Flavor

Extra Butter Flavor        Double Butter Flavor        Light Butter Flavor

Sweet 'n Crunchy Caramel        Sweet 'n Crunchy Kettle Corn        94% Fat Free Butter Flavor
Corn

Kettle Corn

3.     Defendants also advertise the Products on several websites. For example, on Walmart.com, Defendants claim that its Products have "ingredients to feel good about" and depicts images of children eating Defendants' Premium Popcorn indicating that it does not contain harmful substances:

3





**The Problem with Defendants' Premium Popcorn**

4.      Defendants' Premium Popcorn contains extremely high levels of harmful chemicals called Per- and polyfluoroalkyl substances ("PFAS") which are a safety hazard to humans and the environment. Independent analytical testing has shown that Defendants' Premium Popcorn contains 3,641 parts-per-million ("ppm") of total Fluorine content, demonstrating that it is contaminated with PFAS.

5.      Defendants' popcorn is unlike other microwave popcorn products on the market. Other products do not contain PFAS. The testing results from several popular popcorn brands

with comparisons to "hazardous waste" as defined by federal regulations are as follows:

| Product | Results |
|---|---|
| **Pop Secret Microwave Popcorn** | **3,641 ppm** |
| ***Hazardous/Dangerous Waste (e.g., arsenic, benzene, chloroform, mercury)[1]*** | ***100 ppm*** |
| Act II Butter Lovers Popcorn | < 10 ppm |
| Skinny Pop | < 10 ppm |
| Newman's Own Organics | < 10 ppm |
| 365 Organic Butter Flavor Popcorn | < 10 ppm |

6.     Experts have concluded that if a product has over 20 ppm of total Fluorine, then the producer has intentionally added PFAS.[2] Thus, the tests results show that Defendants have purposefully added PFAS to the Products. Insofar as it made its way into the Products by accident, it follows that it was due to inadequate manufacturing process controls by either Defendants and/or its agents.

7.     California law prohibits any person from distributing, selling, or offering for sale in the state any "food packaging that contains regulated perfluoroalkyl and polyfluoroalkyl substances or PFAS." Cal. Health & Saf. Code § 109000(b); *see also* Assembly Bill No. 1200 (Oct. 5, 2021). California law further prohibits the "presence of PFAS in a product or product component at or above 100 parts per million, as measured in total organic fluorine." Cal. Health & Saf. Code § 109000(a)(3)(B). It also prohibits manufacturers from intentionally adding PFAS to food packaging. Cal. Health & Saf. Code § 109000(a)(3)(A). The law requires "a manufacturer to use the least toxic alternative when replacing regulated perfluoroalkyl and polyfluoroalkyl substances or PFAS in food packaging to comply with this requirement." Cal.

---

[1] "Hazardous Waste" is defined in 40 C.F.R. Part 261. For example, Washington's Dangerous Waste Regulation requires PFAS present in waste above 100 ppm to be disposed as "dangerous waste."Department of Ecology State of Washington, *Per- and Polyfluoroalkyl Substances Chemcial Action Pan* (September 2022) available at www. efaidnbmnnnibpcajpcglclefindmkaj/https://apps.ecology.wa.gov/publications/documents/2104 048.pdf

[2]     Kevin Loria, *Dangerous PFAS Chemicals Are in Your Food Packaging*, Consumer Reports (May 2022) available at: https://www.consumerreports.org/health/food-contaminants/dangerous-pfas-chemicals-are-in-your-food-packaging-a3786252074/

CROSNER LEGAL, P.C.

Health & Saf. Code § 109000(c). Defendants violate this law.

8.    To see how often PFAS are found in food containers, *Consumer Reports* tested more than 100 food packaging products from restaurant and grocery chains. The product that had the greatest amount of total Fluorine was a food package from Nathan's hotdogs which contain 876 ppm. Here, Defendants' Premium Popcorn have over four times this amount.

9.    PFAS are synthetic persistent organic pollutants that bioaccumulate and have been detected in human blood serum. PFAS are classified as persistent organic pollutants because of their stability, toxicity, bioaccumulation, and long half-lives in mammals. PFAS have a carbon-fluorine bond, which is one of the strongest single bonds in nature. As a result, these types of chemicals break down very slowly if at all. This has led to PFAS being referred to as "the forever chemical."

10.    Instead of informing consumers of the high levels of PFAS, Defendants labels the Products with several partial representations indicating the Products are safe such as "Premium Popcorn," "100% Whole Grain," "Made with Non-GMO Corn," and "No Artificial Preservatives, Flavors [and] Dyes." The net-effect or net-impression of the Products' labeling on consumers is that the Products do not contain potentially harmful ingredients like PFAS. Reasonable consumers are deceived into thinking that Defendants have not purposefully and/or negligently added PFAS to the Products. Accordingly, Defendants' representations and omissions are deceptive and likely to deceive reasonable consumers. Defendants' advertising and marketing campaign is designed to cause consumers to purchase the Product as a result of this deceptive message. Further, Defendants have omitted material information and failed to disclose to consumers that it has intentionally and/or carelessly added PFAS to the Products.

11.    Plaintiffs and the putative class suffered economic damages due to Defendants' misconduct and seek injunctive relief to halt the sales of the Products and restitution for the full purchase price of the Products.

### PFAS Are Harmful to Humans

12.    PFAS are linked to a range of negative health effects, including immune system dysfunction, developmental and reproductive problems, and an increased risk of certain cancers.

CROSNER LEGAL, P.C.

PFAS are a group of man-made chemicals that contain carbon-fluorine bonds, which are among the strongest chemical bonds known. As a result, PFAS are highly resistant to degradation and can persist in the environment for long periods of time. Studies in primates and rodents have shown that PFAS increase the risk of developing cancer, reduce childbirth weight and gestational age, affect hormonal activity, metabolism, among many other health impacts that continue to be studied.

13. Recent studies have shown the relation between serum levels and liver, pancreatic, testicular, and breast cancer, tumor-promoting activities, immunosuppression, estrogenic and non-estrogenic hormonal disruptions, among other adverse effects to human health. PFAS have been linked to several health effects, including developmental problems, liver and kidney damage, and an increased risk of certain cancers. Studies have shown increased triglycerides and other hormonal health effects, identifying certain PFAS as a thyroid hormone disruptor. Epidemiological studies have specifically linked exposure to PFAS with kidney and testicular cancer, low birth weight, thyroid disease, and immunotoxicity in children.

14. The U.S. Department of Health and Human Services-National Toxicology Program recently issued a systematic review which recognized that exposure to PFAS impacts the immune system.[3] After analyzing 33 human studies, 93 animal studies, and 27 in vitro/mechanistic studies, the U.S. Department of Health and Human Services concluded that PFAS are an immune hazard to humans. The report concluded that certain PFAS are "*presumed to be an immune hazard to humans based on high level of evidence*." The U.S. Centers for Disease Control and Prevention ("CDC") also noted that the National Toxicology Program review found exposure to PFAS is an immune hazard to humans.[4]

15. The University of California has published research which concluded: "Studies have linked PFAS to adverse health effects, including high blood pressure, decreased fertility in

---

[3] U.S. Department of Health and Human Services, National Toxicology Program, NTP Monograph Immunotoxicity Associated with Exposure to Perfluorooctanoic Acid or Perfluorooctane Sulfonate; 2016

[4] U.S. Centers for Disease Control and Prevention, Agency for Toxic Substances and Disease Registry. *Per- and Polyfluoroalkyl Substances (PFAS) and Your Health* (Nov. 1, 2022).

women, liver damage, cancer, low birthweight and an increased risk of asthma and thyroid disease."[5]

16.     In fact, the House of Representatives has introduced legislation to ban PFAS from food containers and cookware. *See* Keep Food Containers Safe from PFAS Act of 2019, H.R. 2827, 116th Cong. (2019). The legislation states that PFAS should be "deemed unsafe."

17.     The Senate has introduced legislation which would require the Environmental Protection Agency ("EPA") to designate PFAS substances as "hazardous substances." Prevent Future American Sickness Act of 2020, S. 3227, 116th Cong. (2020).

**The Testing of Defendants' Products**

18.     An independent laboratory which is accredited by the Consumer Product Safety Commission ("CSPC") performed industry-standard analytical testing and found that Defendants' Premium Popcorn contains 3,641 ppm of total Fluorine content. Specifically, the laboratory performed Procedure E9-3 which is an important analytical tool for detecting and quantifying PFAS in environmental samples, and it has been widely used in research, regulatory, and industrial settings to monitor and manage PFAS contamination. Procedure E9-3 involves using combustion ion chromatography (CIC) to measure the amount of total fluorine in a given sample. This method is sensitive and accurate enough to detect even very low levels of fluorine, making it an effective tool for screening samples for the presence of PFAS. The same laboratory has performed PFAS testing for the Center for Environmental Health, Toxic-Free Future, Consumer Reports, The Guardian, and the Sierra Club. Published peer-reviewed research supports the use of this testing method.[6] In fact, the same laboratory and testing method has been utilized by the U.S. Department of Transportation – Federal Aviation Administration to determine PFAS content in certain fire-fighting foams utilized in U.S. airports.[7]

---

[5]     UCLA Center for Human Nutrition, *Eating microwave popcorn increases the level of PFAS in body* (August 5, 2022).

[6]     *See* Yoon-Chul Lee, Min-Sun Lee and Seok-Jong. Jang Jukyeom as the Source of Trace Elements to the Human Body: An Analysis using In-san Jukyeom. J Food Sci Nutr 2016;2:011

[7]     *See* U.S. Department of Transportation, Federal Aviation Administration. Fluorine-Free Foam Testing. July 2022; DOT/FAA/TC-22/23 at 68 ("The total fluorine content of this product is 87 ppm, the highest of samples tested.").

CROSNER LEGAL, P.C.

19.     The U.S. Department of Transportation laboratory tests found total Fluorine content of the fire-fighting foams to range from undetectable to 87 ppm. Defendants' Premium Popcorn contains over 40 times the amount of total Fluorine (41.85 times greater) than the highest total Fluorine content found in fire-fighting foam agents tested by U.S. Department of Transportation.

**Defendants' Competitors Do Not Add PFAS to their Microwave Popcorn Products**

20.     Independent analytical testing using Procedure E9-3 found that popcorn bags sold by other prominent brands contain undetectable levels of total Fluorine. Thus, making Defendants' decision to use such high levels of PFAS in its popcorn bags inexcusable. For example, the popular brands Act II Popcorn, Skinny Pop, Newman's Own Organics, and 365 Organic Butter Flavor Popcorn contain no detectable PFAS as the Fluorine content was below 10 ppm.

**Published Research Finding PFAS in Popcorn Bags**

21.     Yuan et al. (2016) analyzed 42 samples of food packaging made of paper and aluminum, including fast-food wrappers, popcorn packaging, pizza and sandwich boxes, baking paper and aluminum wrappers. The highest levels of PFAS were found in bags of microwave popcorn.[8]

22.     The University of California published research titled "Eating microwave popcorn increases the level of PFAS in body."[9] The research concluded that research suggests that people who regularly consume microwave popcorn have markedly higher levels of PFAS in their bodies.

23.     A study published in 2019 analyzed a decade of data about the eating habits of 10,000 people, which was collected by the Centers for Disease Control and Prevention between

---

[8]     Yuan G, Peng H, Huang C, Hu Y. Ubiquitous Occurrence of Fluorotelomer Alcohols in Eco-friendly Paper-made Food Contact Materials and Their Implication for Human Exposure. Envirnmental Scinece & Technology. 2016.

[9]     UCLA Center for Human Nutrition, *Eating microwave popcorn increases the level of PFAS in body* (August 5, 2022).

CROSNER LEGAL, P.C.

2003 and 2014.[10] Blood samples from the study participants were also collected. The researchers found that people who ate microwave popcorn every day over the course of a year had levels of PFAS that were up to 63% higher than average.

### PFAS Migrate into The Popcorn

24.     There is a significant body of scientific research that has investigated the presence of PFAS in food packaging materials, including microwave popcorn bags, and the potential for migration of PFAS from the packaging into the food.

25.     Dr. David Heber, founding director of the UCLA Center for Human Nutrition, has cautioned that "high levels of these compounds in the blood of people who ate microwave popcorn regularly, so it does get into the bloodstream."[11] A senior scientist at Environmental Working Group, Environmental Health Perspectives stated "during the popping process, PFAS leach into the popcorn, making the snack one of the most notorious means by which the chemicals enter human bodies."

26.     Carnero et al. (2021)'s research found convincing evidence that PFAS are in some microwave popcorn bags. The authors noted that food contact materials, such as Defendants' Premium Popcorn bags, can lead to dietary exposure through the migration into food, which is a safety concern. The published research noted that food-contact materials ("FCM") such as Defendants' Premium Popcorn bags "represent a health risk, since these can migrate into food and be ingested, and also being a risk to the environment, since they can be released in the process of eliminating these materials." Carnero et al. (2021) ultimately concluded: "it can be stated that perfluoroalkylated and polyfluoroalkylated substances are still being used in FCM as fast-food wrappers, muffin packaging, baking paper, plates, and microwave popcorn bags. Some of them can reach very high temperatures and are in contact

---

[10]     Susmann HP, Schaider LA, Rodgers KM, Rudel RA. Dietary Habits Related to Food Packaging and Population Exposure to PFASs. Environmental Health Perspectives. Oct. 2019;127(10).

[11]     Tufts Medicine, *With PFAS in Packaging, How Safe Is Microwave Popcorn?* (Aug. 31, 2022) available at: https://www.circle-health.org/health-and-wellness/health-library/with-pfas-in-packaging-how-safe-is-microwave-popcorn.

CROSNER LEGAL, P.C.

with fatty acids, which can lead in migration of PFAS into food."

27.     Susmann et al. (2019)[12] analyzed blood serum levels over a nine-year period to determine the serum levels of PFAS. The researchers concluded that there is an association between serum PFAS and popcorn consumption. The authors advised that the food industry use alternatives to PFAS in food packaging because FCM contribute to PFAS exposure and create a health concern considering the toxicity and persistence of PFAS.

**Reasonable Consumers Are Deceived by Defendants' Misrepresentations and Omissions**

28.     Consumers, like Plaintiffs, relied on Defendants' representations that the Products are "Premium Popcorn," "100% Whole Grain," "Made with Non-GMO Corn," and "No Artificial Preservatives, Flavors [and] Dyes." The net-effect or net-impression of the Products' labeling on consumers is that the Products do not contain harmful ingredients like PFAS. Reasonable consumers are deceived into thinking that Defendants have not purposefully added PFAS to the Products.

29.     Consumers, like Plaintiffs, want to know if a product they eat contains substances which are hazardous to their health. Defendants' nondisclosure of the high levels of PFAS in the Products is material because reasonable consumers would deem the presence of PFAS in the Products to be important in determining whether to purchase Defendants' Premium Popcorn. Defendants have exclusive knowledge that it adds PFAS to the Products. The fact that Defendants' Premium Popcorn contains PFAS is not reasonable accessible to Plaintiffs and consumers. Consumers, like Plaintiffs, trust that the food products they purchase do not contain persistent organic pollutants which have been intentionally or negligently added to the products. Defendants have a duty to disclose the presence of PFAS in the Products because the fact is known to Defendants (it added the PFAS), and the failure to disclose the PFAS in the Products is misleading. The high levels of dangerous substances such as the PFAS in the Products implicates a health concern that is important to reasonable consumers when deciding to purchase

CROSNER LEGAL, P.C.

---

[12]     Susmann HP, Schaider LA, Rodgers KM, Rudel RA. Dietary Habits Related to Food Packaging and Population Exposure to PFASs. Environmental Health Perspectives. Oct. 2019;127(10).

11

CROSNER LEGAL, P.C.

Defendants' Premium Popcorn.  Defendants have actively concealed the high levels of PFAS in the Products from Plaintiffs and putative class members.

30.     A failure to disclose a fact constitutes actionable conduct if the omission goes to the central function of the product. Here, the popcorn's central function is for people to safely consume the product.  Popcorn which contains harmful PFAS in extremely high levels does not serve its central function. Further, the popcorn bag's central function is to pop the popcorn without leaching hazardous chemicals into the popcorn, and thus, the Product does not serve its central function. Reasonable consumers, like Plaintiffs, would deem it important in determining whether to purchase the Premium Popcorn because Plaintiffs would not have purchased the Products had they known that harmful chemicals like PFAS were in the Products. That is, the omission of the DNOP content of the Products was material because a reasonable consumer would deem it important in determining how to act in the transaction at issue.

31.     A failure to disclose a fact constitutes actionable conduct if the omission causes an unreasonable safety hazard. Here, it is not reasonable to sell a product that consumers eat with high levels of PFAs above the legal limit. As explained above, PFAS are a safety hazard because they cause several negative health effects in humans including immune system dysfunction, developmental and reproductive problems, and an increased risk of certain cancers.

32.     Defendants also made partial representations that the products are safe, including "Premium Popcorn," "No Artificial Preservatives Flavors Dyes," "100% Whole Grain," "Made with Non-GMO Corn," and "No High Fructose Corn Syrup" which create the net-impression that the Products did not contain potentially harmful ingredients like PFAS. These partial disclosures are misleading because the PFAS content of the Products was not disclosed.

**Plaintiffs and Putative Class Members Suffered Economic Injury**

33.     Plaintiffs and putative class members suffered economic injury as a result of Defendants' actions. Plaintiffs and putative class members spent money that, absent Defendants' actions, they would not have spent. With all the other microwave products on the market without PFAS, a reasonable consumer would choose to purchase a product without PFAS and not Defendants' Premium Popcorn. Plaintiffs and putative class members are entitled to damages

CROSNER LEGAL, P.C.

and restitution for the purchase price of the Products that were defective, not merchantable, and not fit for their represented purpose. Consumers, including Plaintiffs, would not have purchased Defendants' Premium Popcorn if they had known the Products contain extremely high levels of PFAS, a substance which has known adverse health effects on humans. Defendants did not disclose that it intentionally adds PFAS to the Products.

34.     Making matters worse, Defendants' competitors, such as ACT II and many other popular brands, do not add PFAS to their popcorn products. Thus, there are safer alternatives that Plaintiffs and class members would have purchased but were denied the benefit-of-the bargain as a result of Defendants' concealment of the PFAS in the Products. Because PFAS are a hazard to human health, Defendants have a continuing duty to disclose the presence of PFAS in the Products to consumers. Defendants have failed to adequately disclose that the Products contain PFAS. Defendants' Premium Popcorn contains a hidden defect and Plaintiffs and putative class members suffered economic injury. Had Plaintiffs and putative class members known about the PFAS, they would not have purchased the products or would have paid less for the Products.

35.     Accordingly, Plaintiffs bring this action individually and on behalf of other similarly situated consumers to halt the dissemination of Defendants' deceptive advertising message, correct the deceptive perception it has created in the minds of consumers, and obtain redress for those who have purchased the Products. As a consequence of Defendants' deceptive labeling and material omissions, Plaintiffs allege Defendants have violated and is violating California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.* (the "CLRA"), California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* (the "UCL") and constitutes a breach of implied warranties.

**No Adequate Remedy at Law**

36.     Plaintiffs and members of the class are entitled to equitable relief as no adequate remedy at law exists. The statutes of limitations for the causes of action pled herein vary. Class members who purchased the Product more than three years prior to the filing of the complaint will be barred from recovery if equitable relief were not permitted under the UCL.

37.     The scope of actionable misconduct under the unfair prong of the UCL is broader than the other causes of action asserted herein. It includes Defendants' overall unfair marketing scheme to promote and brand the Products, across a multitude of media platforms, including the Product' labels and packaging, over a long period of time, in order to gain an unfair advantage over competitor products. The UCL also creates a cause of action for violations of law (such as statutory or regulatory requirements and court orders related to similar representations and omissions made on the type of products at issue). This is especially important here because Plaintiffs allege Defendants have committed "unlawful" acts and brings a claim for violation of the UCL's "unlawful prong." Specifically, Defendants have violated Cal. Health & Saf. Code § 109000, among other laws. No other causes of actions allow this claim to proceed, and thus, there is no adequate remedy at law for this specific violation of the UCL's unlawful prong. Plaintiffs' UCL unlawful prong claim does not rest on the same conduct as his other causes of action, and there is no adequate remedy at law for this specific claim. Plaintiffs and class members may also be entitled to restitution under the UCL, while not entitled to damages under other causes of action asserted herein (e.g., the CLRA is limited to certain types of plaintiffs (an individual who seeks or acquires, by purchase or lease, any goods or services for personal, family, or household purposes) and other statutorily enumerated conduct).

38.     Injunctive relief is appropriate on behalf of Plaintiffs and members of the class because Defendants continue to omit material facts about the Products. Injunctive relief is necessary to prevent Defendants from continuing to engage in the unfair, fraudulent, and/or unlawful conduct described herein and to prevent future harm—none of which can be achieved through available legal remedies (such as monetary damages to compensate past harm). Injunctive relief, in the form of affirmative disclosures is necessary to dispel the public misperception about the Products that has resulted from years of Defendants' unfair, fraudulent, and unlawful marketing efforts. Such disclosures would include, but are not limited to, publicly disseminated statements that the Products' containing PFAS; and/or requiring prominent qualifications and/or disclaimers on the Products' front label concerning the Products' true nature. An injunction requiring affirmative disclosures to dispel the public's misperception, and

1  prevent the ongoing deception and repeat purchases, is also not available through a legal remedy

2  (such as monetary damages). In addition, Plaintiffs are *currently* unable to accurately quantify

3  the damages caused by Defendants' future harm, because discovery and Plaintiffs' investigation

4  have not yet completed, rendering injunctive relief necessary. Further, because a public

5  injunction is available under the UCL, and damages will not adequately benefit the general

6  public in a manner equivalent to an injunction.

7       39.    It is premature to determine whether an adequate remedy at law exists. This is an

8  initial pleading and discovery has not yet commenced and/or is at its initial stages. No class has

9  been certified yet. No expert discovery has commenced and/or completed. The completion of

10  fact/non-expert and expert discovery, as well as the certification of this case as a class action,

11  are necessary to finalize and determine the adequacy and availability of all remedies, including

12  legal and equitable, for Plaintiffs' individual claims and any certified class or subclass. Plaintiffs

13  therefore reserve their right to amend this complaint and/or assert additional facts that

14  demonstrate this Court's jurisdiction to order equitable remedies where no adequate legal

15  remedies are available for either Plaintiffs and/or any certified class or subclass. Such proof, to

16  the extent necessary, will be presented prior to the trial of any equitable claims for relief and/or

17  the entry of an order granting equitable relief.

18       **JURISDICTION AND VENUE**

19       40.    This Court has original jurisdiction over this action pursuant to 28 U.S.C. §

20  1332(d) because this is a class action in which: (1) there are over 100 members in the proposed

21  class; (2) members of the proposed class have a different citizenship from Defendant; and (3)

22  the claims of the proposed class members exceed $5,000,000 in the aggregate, exclusive of

23  interest and costs.

24       41.    This Court has personal jurisdiction over Defendants because Defendants

25  conducts and transacts business in the State of California, contracts to supply goods within the

26  State of California, and supplies goods within the State of California. Defendants, on its own

27  and through its agents, is responsible for the formulation, ingredients, manufacturing, labeling,

28  marketing, and sale of the Products in California, specifically in this district. Defendants actively

CROSNER LEGAL, P.C.

15

CROSNER LEGAL, P.C.

directs California consumers to purchase the Products in California.[13] The marketing of the Products, including the decision of what to include and not include on the labels, emanates from Defendants. Thus, Defendants have intentionally availed itself of the markets within California through its advertising and marketing of the Product to consumers, including Plaintiffs. The Court also has specific jurisdiction over the Defendants as they have purposefully directed activities towards the forum state, Plaintiffs' claims arise out of those activities, and it reasonable for Defendants to defend this lawsuit because they have sold harmful Products to Plaintiffs and members of the Class in California. By distributing and selling the Products in California, Defendants have intentionally expressly aimed conduct at California which caused harm to Plaintiffs and the Class which Defendants know is likely to be suffered by Californians.

42.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because Defendants engage in continuous and systematic business activities within the State of California. Venue is also proper in this District pursuant to Cal. Civ Code. § 1780(c) because Defendant is doing business in this District, and a Plaintiff purchased the products at issue in the District.

## **PARTIES**

43.     Plaintiff Ashley Wright is a citizen of and resides in Contra Costa County, California. For approximately the past year, Ms. Wright has purchased Defendants' Premier Popcorn Pop Secret Movie Theater Butter at the Lucky Supermarket and Safeway retail stores located in Pinole, California and paid about $4 for the Product. Ms. Wright's last purchase of Defendants' Premier Popcorn occurred around November 2022. Ms. Wright was not aware of the PFAS in the Product. After reading the label, Ms. Wright purchased the popcorn on the assumption that the labeling was accurate, and that the Product did not contain harmful substances such as PFAS. Plaintiff saw and relied on the labeling statements "Premium Popcorn," "No Artificial Preservatives Flavors Dyes," "100% Whole Grain," "Made with Non-

---

[13]     *See* https://www.popsecret.com/where-to-buy/ (Defendants' website provides California retail store locations that sell the Products to California consumers)

GMO Corn," and "No High Fructose Corn Syrup" which created the net-impression that the Products did not contain potentially harmful ingredients like PFAS. Ms. Wright would not have purchased Defendants' Premier Popcorn had she known the Product contained PFAS, a substance which is known to be hazardous to human health. As a result, Ms. Wright suffered injury in fact when she spent money to purchase Defendants' Premier Popcorn she would not have purchased absent Defendants' misconduct. Ms. Wright is not bringing a personal injury claim.

44.     Plaintiff Serina Santiago is a citizen of and resides in Solano County, California. For the past several years, Ms. Santiago has purchased Defendants' Premier Popcorn Pop Secret Movie Theater Butter approximately every three months at retail stores in Solano County including at the Walmart retail store located in Fairfield, California. Plaintiff paid approximately $6 for Defendants' Premier Popcorn. When purchasing the popcorn, Ms. Santiago was not aware of the PFAS in the Product. Ms. Santiago purchased the Product on the assumption that the labeling was accurate, and that the Product did not contain harmful substances such as PFAS. Plaintiff saw and relied on the labeling statements "Premium Popcorn," "No Artificial Preservatives Flavors Dyes," "100% Whole Grain," "Made with Non-GMO Corn," and "No High Fructose Corn Syrup" which created the net-impression that the Products did not contain potentially harmful ingredients like PFAS. Plaintiff Santiago would not have purchased Defendants' Premier Popcorn Pop had she known that the Product contained PFAS, a substance which is known to be hazardous to human health. As a result, Ms. Santiago suffered injury in fact when she spent money to purchase the popcorn Product she would not have purchased absent Defendants' misconduct. Ms. Santiago is not bringing a personal injury claim.

45.     Plaintiffs have not purchased the Products after learning that they contain PFAS. Plaintiffs continue to see the Products for sale at retail stores in California and desire to purchase the Products again if the Products did not contain PFAS.  However, as a result of Defendants' ongoing misrepresentations and material omissions, Plaintiffs are unable to rely on the Products' labeling when deciding in the future whether to purchase the Products.

46.     Plaintiffs did not notice any disclaimer, qualifier, or other explanatory statement

CROSNER LEGAL, P.C.

CROSNER LEGAL. P.C.

or information on the Products' labeling or packaging that disclosed that the Products contained PFAS. At the time of Plaintiffs' purchases, they did not know the Products contained PFAS.

47.     Campbell is headquartered in Camden, New Jersey. In response to Plaintiffs' Consumers Remedies Act correspondence to Snyder's-Lance, counsel for Campbell responded, demonstrating that Campbell

48.     On March 26, 2018, Campbell's acquired Snyder's-Lance for $6.1 billion. Denise Morrison, the CEO of Campbell, states: "The combination of Campbell and Snyder's-Lance creates a unique, diversified snacking portfolio of differentiated brands and a large variety of better-for-you snacks for consumers. I am excited about the combination and confident that it will create significant shareholder value through both revenue growth and cost synergies." To unlock the power of the combined brand portfolio, and achieve both cost and potential revenue opportunities, Campbell integrated the Snyder's-Lance portfolio to create a unified snacking organization called Campbell Snacks. "The Campbell Snacks team will focus on optimizing the value of our U.S. snacks business to deepen our partnership with customers through the power of the combined portfolio." The Pop Secret brand is owned and operated by Campbell. Because Campbell runs the Pop Secret brand and is heavily involved in the marketing, manufacturing, and distribution of Pop Secret products, the degree of control Campbell exerts over Snyder's-Lance is substantial and renders Snyder's-Lance an agent of Campbell. Snyder's-Lance and Campbell are agents. Indeed, the Pop Secret website is run by the "Campbell Soup Company."[14] A consumer that uses the Pop Secret website forms an agreement with Campbell showing that Campbell runs the day-to-day operations of the Pop Secret brand. Campbell owns and operates the intellectual property of Pop Secret.[15] Thus, Campbell uses Snyder's-Lance as a marketing conduit in an attempt to shield itself for lability.

49.     Campbell's agent, Snyder's-Lance, assists Campbell in the manufacture, marketing, advertising, sale, and distribution the Products throughout the United States,

---

[14]     When clicking on the Terms of Use on the popsecert.com website the user is brought to https://www.campbellsoupcompany.com/terms-of-use/. Similarly, when a user clicks on the "Privacy Policy" on the popsecret.com website a user is brought to the Campbell Soup website.
[15]     *Id.*

18

including in California. Its principal place of business is located at in Charlotte, North Carolina. Like Campbell, Snyder's-Lance also conducts substantial business in California because as agents of the same enterprise Campbell and Snyder's-Lance has sold hundreds of thousands (and probably more) of Premium Popcorn products in California to Californians during the last four years. Snyder's-Lance is a crucial part of what is, in essence, a single business enterprise with Campbell at the helm.

50.    At all times relevant herein, Defendants and their subsidiaries, affiliates, and other related entities, as well as their respective employees, were the agents, servants, and employees of Defendants, and at all times relevant herein, each were acting within the course and scope of that agency and employment.

51.    The planning and execution of the advertising, marketing, labeling, packaging, testing, manufacturing and/or business operations concerning the Products were primarily, if not solely, carried out by Defendants. Defendants maintains warehouses in California and has Californian employees.[16] Defendants purposefully direct their actions towards California state as they have committed intentional acts expressly aimed at the forum state (selling, distributing, and marketing the Products in California which caused harm that the defendant knows is likely to be suffered in Californian (i.e., purchase of the Products by consumers). The sale of the Products is not an isolated occurrence.

## CLASS ALLEGATIONS

52.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of the following Class:

> All persons who purchased the Products for personal use in California within the applicable statute of limitations until the date class notice is disseminated.

53.    Excluded from the class are: (i) Defendants and their officers, directors, and employees; (ii) any person who files a valid and timely request for exclusion; and (iii) judicial officers and their immediate family members and associated court staff assigned to the case.

---

[16]    *See* https://geebo.com/jobs-online/view/id/348435457-warehouse-coordinator-/mobile/1

CROSNER LEGAL. P.C.

1
2
3

54.     Plaintiffs reserves the right to amend or otherwise alter the class definition presented to the Court at the appropriate time, or to propose or eliminate sub-classes, in response to facts learned through discovery, legal arguments advanced by Defendants, or otherwise.

4
5
6

55.     The Class is appropriate for certification because Plaintiffs can prove the elements of the claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

7
8
9

56.     Numerosity: Class Members are so numerous that joinder of all members is impracticable. Plaintiffs believe that there are thousands of consumers who are Class Members described above who have been damaged by Defendants' deceptive and misleading practices.

10
11
12
13

57.     Commonality: There is a well-defined community of interest in the common questions of law and fact affecting all Class Members. The questions of law and fact common to the Class Members which predominate over any questions which may affect individual Class Members include, but are not limited to:

14
15

a.      Whether Defendants is responsible for the conduct alleged herein which was uniformly directed at all consumers who purchased the Products;

16
17
18

b.      Whether Defendants' misconduct set forth in this Complaint demonstrates that Defendants engaged in unfair, fraudulent, or unlawful business practices with respect to the advertising, marketing, and sale of the Product;

19
20

c.      Whether Defendants made material omissions concerning the Products that were likely to deceive the public;

21

d.      Whether Plaintiffs and the Class are entitled to injunctive relief;

22
23

e.      Whether Plaintiffs and the Class are entitled to money damages under the same causes of action as the other Class Members.

24
25
26
27

58.     Typicality: Plaintiffs are members of the Class Plaintiffs seeks to represent. Plaintiffs' claims are typical of the claims of each Class Member in that every member of the Class was susceptible to the same deceptive, misleading conduct and purchased the Products. Plaintiffs are entitled to relief under the same causes of action as the other Class Members.

28

CROSNER LEGAL, P.C.

CLASS ACTION COMPLAINT

CROSNER LEGAL, P.C.

59.     Adequacy: Plaintiffs are adequate Class representatives because Plaintiffs' interests do not conflict with the interests of the Class Members Plaintiffs seek to represent; the consumer fraud claims are common to all other members of the Class, and Plaintiffs have a strong interest in vindicating Plaintiffs' rights; Plaintiffs have retained counsel competent and experienced in complex class action litigation and Plaintiffs intend to vigorously prosecute this action. Plaintiffs have no interests which conflict with those of the Class. The Class Members' interests will be fairly and adequately protected by Plaintiffs and proposed Class Counsel. Defendants have acted in a manner generally applicable to the Class, making relief appropriate with respect to Plaintiffs and the Class Members. The prosecution of separate actions by individual Class Members would create a risk of inconsistent and varying adjudications.

60.     The Class is properly brought and should be maintained as a class action because a class action is superior to traditional litigation of this controversy. A class action is superior to the other available methods for the fair and efficient adjudication of this controversy because:

a.   The joinder of hundreds of individual Class Members is impracticable, cumbersome, unduly burdensome, and a waste of judicial and/or litigation resources;

b.   The individual claims of the Class Members may be relatively modest compared with the expense of litigating the claim, thereby making it impracticable, unduly burdensome, and expensive to justify individual actions;

c.   When Defendants' liability has been adjudicated, all Class Members' claims can be determined by the Court and administered efficiently in a manner far less burdensome and expensive than if it were attempted through filing, discovery, and trial of all individual cases;

d.   This class action will promote orderly, efficient, expeditious, and appropriate adjudication and administration of Class claims;

e.   Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action;

f.   This class action will assure uniformity of decisions among Class Members;

g.   The Class is readily definable and prosecution of this action as a class action will eliminate the possibility of repetitious litigation; and

21

1    h.   Class Members' interests in individually controlling the prosecution of separate
2    actions is outweighed by their interest in efficient resolution by single class action;

3        61.   In the alternative, the Class also may be certified because Defendants have acted
4    or refused to act on grounds generally applicable to the Class thereby making final declaratory
5    and/or injunctive relief with respect to the members of the Class as a whole, appropriate.

6        62.   Plaintiffs seek preliminary and permanent injunctive and equitable relief on
7    behalf of the Class, on grounds generally applicable to the Class, to enjoin and prevent
8    Defendants from engaging in the acts described, and to require Defendants to provide full
9    restitution to Plaintiffs and Class members.

10       63.   Unless the Class is certified, Defendants will retain monies that were taken from
11   Plaintiffs and Class members as a result of Defendants' wrongful conduct. Unless a classwide
12   injunction is issued, Defendants will continue to commit the violations alleged and the members
13   of the Class and the general public will continue to be misled.

14                        **FIRST CLAIM FOR RELIEF**

15                **Violation of California's Consumers Legal Remedies Act**

16                     **Cal. Civ. Code § 1750 *et seq.***

17       64.   Plaintiffs reallege and incorporate by reference all allegations contained in this
18   complaint, as though fully set forth herein.

19       65.   Plaintiffs bring this claim under the CLRA individually and on behalf of the Class
20   against Defendants.

21       66.   At all times relevant hereto, Plaintiffs and the members of the Class were
22   "consumer[s]," as defined in California Civil Code section 1761(d).

23       67.   At all relevant times, Defendants constituted a "person," as defined in California
24   Civil Code section 1761(c).

25       68.   At all relevant times, the Product manufactured, marketed, advertised, and sold
26   by Defendants constituted "goods," as defined in California Civil Code section 1761(a).

27       69.   The purchases of the Products by Plaintiffs and the members of the Class were
28   and are "transactions" within the meaning of California Civil Code section 1761(e).

70. Defendants disseminated, or caused to be disseminated, through their advertising, false and misleading representations, including the Products' labeling that they do not contain hazardous substances such as PFAS. Defendants fails to disclose that it adds PFAS to the Products. This is a material omission as reasonable consumer would find the fact that the Products contain PFAS to be important to their decision in purchasing the Products. Defendants' representations violate the CLRA in the following ways:

(a) Defendants represented that the Product have characteristics, ingredients, uses, and benefits which they do not have (Cal. Civ. Code § 1770(a)(5));

(b). Defendants represented that the Product are of a particular standard, quality, or grade, which they are not (Cal. Civ. Code § 1770(a)(7));

(c) Defendants advertised the Product with an intent not to sell the Product as advertised (Cal. Civ. Code § 1770(a)(9)); and

(d) Defendants represented that the subject of a transaction has been supplied in accordance with a previous representation when it has not (Cal. Civ. Code § 1770(a)(16)).

71. Defendants violated the CLRA because the Products contain PFAS which it added to the Products. Defendants knew or should have known that consumers would want to know that the Products contain PFAS. Defendants had a duty to disclose that the Products contain PFAS. Based on the statutory text, legislative history (which includes the National Consumer Act), the judicial decisions and statutes that existed when the CLRA was enacted, the subsequent case law, and the many amendments to the CLRA from 1975 through 2016, failures to disclose material facts are actionable under the CLRA. In particular, subdivision (a)(5), (7), and (9) of Civil Code section 1770 proscribe material omissions. Defendants' labeling of the Products also created the net-impression that the Products do not contain hazardous substances such as PFAS. Defendants had exclusive knowledge of the material fact that it added and/or carelessly added PFAS to the Products and failed to disclose this fact. Defendants actively concealed this material fact. The fact that PFAS were added and/or carelessly added to the Products is material to consumer because reasonable consumer would deem the existence of PFAS in a product they eat important in determining whether to buy the Products.

CROSNER LEGAL, P.C.

1   72.     Defendants' actions as described herein were done with conscious disregard of

2   Plaintiffs' and the Class members' rights and were wanton and malicious.

3   73.     Defendants' wrongful business practices constituted, and constitute, a continuing

4   course of conduct in violation of the CLRA, since Defendants is still representing that the

5   Product have characteristics which they do not have.

6   74.     Pursuant to California Civil Code section 1782(d), Plaintiffs and the members of

7   the Class seek an order enjoining Defendants from engaging in the methods, acts, and practices

8   alleged herein, and for restitution and disgorgement.

9   75.     Pursuant to California Civil Code section 1782, Plaintiffs notified Defendants in

10  writing by certified mail of the alleged violations of the CLRA and demanded that Defendants

11  rectify the problems associated with the actions detailed above and give notice to all affected

12  consumers of their intent to so act. Defendants have failed to rectify or agree to rectify the

13  problems associated with the actions detailed herein and give notice to all affected consumers

14  within 30 days of the date of written notice pursuant to section 1782 of the CLRA. Plaintiffs will

15  actual, punitive, and statutory damages, as appropriate.

16  76.     Pursuant to section 1780(d) of the CLRA, attached as **Exhibit 1** is an affidavit

17  showing that this action was commenced in a proper forum.

18  **SECOND CLAIM FOR RELIEF**

19  **Violation of California's Unfair Competition Law**

20  **Cal. Bus. & Prof. Code § 17200 *et seq.***

21  77.     Plaintiffs reallege and incorporate by reference all allegations contained in this

22  complaint, as though fully set forth herein.

23  78.     Plaintiffs bring this claim under the UCL individually and on behalf of the Class

24  against Defendants.

25  79.     The UCL prohibits any "unlawful," "fraudulent," or "unfair" business act or

26  practice and any false or misleading advertising.

27  80.     Defendants committed unlawful business acts or practices by making the

28  representations and omitted material facts (which constitutes advertising within the meaning of

CROSNER LEGAL, P.C.

24

California Business & Professions Code section 17200), as set forth more fully herein, and violating California Civil Code sections 1573, 1709, 1711, 1770(a)(5), (7), (9) and (16), California Business & Professions Code section 17500 *et seq.*, California common law breach of implied warranties, and Cal. Health & Saf. Code § 109000 (*see supra* at ¶ 7). Plaintiffs, individually and on behalf of the other Class members, reserve the right to allege other violations of law, which constitute other unlawful business acts or practices. Such conduct is ongoing and continues to this date.

81.     Defendants committed "unfair" business acts or practices by: (1) engaging in conduct where the utility of such conduct is outweighed by the harm to Plaintiffs and the members of the a Class; (2) engaging in conduct that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to Plaintiffs and the members of the Class; and (3) engaging in conduct that undermines or violates the intent of the consumer protection laws alleged herein. There is no societal benefit from deceptive advertising. Plaintiffs and the other Class members paid for a Product that is not as advertised by Defendants. Further, Defendants failed to disclose a material fact (the addition of PFAS to the Products) of which had exclusive knowledge. While Plaintiffs and the other Class members were harmed, Defendants were unjustly enriched by its false misrepresentations and material omissions. As a result, Defendants' conduct is "unfair," as it offended an established public policy. There were reasonably available alternatives to further Defendants' legitimate business interests, other than the conduct described herein. For example, several of Defendants' competitors sell microwave popcorn that does not contain PFAS.

82.     Defendants committed "fraudulent" business acts or practices by making the representations of material fact regarding the Products set forth herein. Defendants' business practices as alleged are "fraudulent" under the UCL because they are likely to deceive customers into believing the Products do not contain added and/or carelessly added hazardous substance such as PFAS.

83.     Plaintiffs and the other members of the Class have in fact been deceived as a result of their reliance on Defendants' material representations and omissions. This reliance has

caused harm to Plaintiffs and the other members of the Class, each of whom purchased Defendants' Product. Plaintiffs and the other Class members have suffered injury in fact and lost money as a result of purchasing the Product and Defendants' unlawful, unfair, and fraudulent practices.

84.    Defendants' wrongful business practices and violations of the UCL are ongoing.

85.    Plaintiffs and the Class seek pre-judgment interest as a direct and proximate result of Defendants' unfair and fraudulent business conduct. The amount on which interest is to be calculated is a sum certain and capable of calculation, and Plaintiffs and the Class seek interest in an amount according to proof.

86.    Unless restrained and enjoined, Defendants will continue to engage in the above-described conduct. Accordingly, injunctive relief is appropriate. Pursuant to California Business & Professions Code section 17203, Plaintiffs, individually and on behalf of the Class, seek (1) restitution from Defendants of all money obtained from Plaintiffs and the other Class members as a result of unfair competition; (2) an injunction prohibiting Defendants from continuing such practices in the State of California that do not comply with California law; and (3) all other relief this Court deems appropriate, consistent with California Business & Professions Code section 17203.

<u>**THIRD CLAIM FOR RELIEF**</u>

**Breach of Implied Warranties**

87.    Plaintiffs realleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

88.    Plaintiffs bring this claim individually and on behalf of the Class against Defendants.

89.    Defendants were at all relevant times the manufacturer, distributor, and/or warrantor of the Products. Defendants knew or had reason to know of the specific use for which its Products were purchased.

90.    Defendants, through the acts and omissions set forth herein, in the sale, marketing, and promotion of the Products made implied representations to Plaintiffs and the

CROSNER LEGAL, P.C.

Class that the Product was fit for the particular purpose of consumption. However, the Products are hazardous to consume. Further, Defendants cannot legally sell the product in California, and thus, by definition hey are not fit for the particular purpose of consumption. *See* Health & Saf. Code § 109000. At the time the Products were sold, Defendants knew or should have known that Plaintiffs and members of the Class would rely on Defendants' skill and judgment regarding the safety and composition of the Products. Because the Products contain PFAS, they are not of the same quality as those generally accepted in the trade and were not fit for the ordinary purposes for which the Products are used (i.e., consumption).

91.     By advertising and selling the Product at issue, Defendants, a merchant of goods, made promises and affirmations of fact that the Products are merchantable and conform to the promises or affirmations of fact made on the Products' packaging and labeling, and through its marketing and advertising, as described herein. This labeling and advertising, combined with the implied warranty of merchantability, constitute warranties that became part of the basis of the bargain between Plaintiffs and members of the Class and Defendants. Defendants labeling and advertising, combined with the implied warranty of merchantability, constitute a warranty that the Products do not contain hazardous substances such as PFAS.

92.     In reliance on Defendants' skill and judgment and the implied warranties of fitness for this purpose and merchantability, Plaintiffs and members of the Class purchased the Products for use to consume. Defendants knew that the Products would be purchased and used without further testing by Plaintiffs and Class members.

93.     Consumers are the intended beneficiaries of the implied warranty as they are the ones Defendants made the Products for and specifically marketed the Products to consumers. Defendants breached the implied warranty of merchantability. Because the Products contain high levels of added PFAS, they are not fit for ordinary use (i.e., consumption).

94.     As a direct and proximate result of Defendants' breach warranty, Plaintiffs and members of the Class were harmed in the amount of the purchase price they paid for the Products. Further, Plaintiffs and members of the Class have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the

Products, and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiffs seek a monetary award for breach of warranty in the form of damages, restitution, and/or disgorgement of ill-gotten gains to compensate Plaintiffs and the Class for the loss of that money, as well as injunctive relief to enjoin Defendants' misconduct to prevent ongoing and future harm that will result.

95.    Plaintiffs seek punitive damages pursuant to this cause of action for breach of warranty on behalf of Plaintiffs and the Class. Defendants' unfair, fraudulent, and unlawful conduct described herein constitutes malicious, oppressive, and/or fraudulent conduct warranting an award of punitive damages as permitted by law. Defendants' misconduct is malicious as Defendants acted with the intent to cause Plaintiffs and consumers to pay for Products that they were not, in fact, receiving. Defendants willfully and knowingly disregarded the rights of Plaintiffs and consumers as Defendants were aware of the probable dangerous consequences of its conduct and deliberately failed to avoid misleading consumers, including Plaintiffs. Defendants' misconduct is oppressive. Reasonable consumer would look down upon it and/or otherwise would despise such misconduct. This misconduct subjected Plaintiffs and consumers to cruel and unjust hardship in knowing disregard of their rights. Defendants' misconduct is fraudulent as Defendants, at all relevant times, intentionally misrepresented and/or concealed material facts with the intent to deceive Plaintiffs and consumers. The wrongful conduct constituting malice, oppression, and/or fraud was committed, authorized, adopted, approved, and/or ratified by officers, directors, and/or managing agents of Defendants.

### REQUEST FOR RELIEF

Plaintiffs, individually, and on behalf of all others similarly situated, requests for relief pursuant to each claim set forth in this complaint, as follows:

a.    Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiffs as Class Representative and appointing the undersigned counsel as Class Counsel;

b.    Ordering restitution and disgorgement of all profits and unjust enrichment that Defendants obtained from Plaintiffs and the Class members as a result of Defendants' unlawful,

unfair, and fraudulent business practices;

     c.     Ordering injunctive relief as permitted by law or equity, including enjoining Defendants from continuing the unlawful practices as set forth herein, and ordering Defendants to engage in a corrective advertising campaign;

     d.     Ordering damages for Plaintiffs and the Class;

     e.     Ordering Defendants to pay attorneys' fees and litigation costs to Plaintiffs and the other members of the Class;

     f.     Ordering Defendants to pay both pre- and post-judgment interest on any amounts awarded; and

     g.     Ordering such other and further relief as may be just and proper.

### JURY DEMAND

Plaintiffs demand a trial by jury of all claims in this Complaint so triable.

Dated: June 30, 2023          CROSNER LEGAL, P.C.

By:    /s/ Craig W. Straub
    CRAIG W. STRAUB

9440 Santa Monica Blvd. Suite 301
Beverly Hills, CA 90210
Tel: (866) 276-7637
Fax: (310) 510-6429
craig@crosnerlegal.com

*Attorneys for Plaintiffs*

CROSNER LEGAL, P.C.

CLASS ACTION COMPLAINT